COMMONWEALTH OF MASSACHUSETTS

Worcester, ss.                                                        Superior Court Department
                                                                      CA. No. 00-2384

|  |  |
|---|---|
| KERRI A. ELLIS, ADMINISTRATRIX OF THE ESTATE OF SUSAN E. CASTELL, Plaintiff, v. 344 PROVIDENCE ROAD REALTY TRUST and RICHARD J. WUNSCHEL, Defendants | ) ) ) ) ) ) ) ) ) ) ) ) |

## AFFIDAVIT OF CHARLES J. DINEZIO

Being duly sworn, Charles J. Dinezio states as follows:

1. My name is Charles J. Dinezio. I am the principal and president of a firm that provides a variety of services to the building construction industry including building code interpretations and plan reviews for code compliance. I have also served as the Executive Director of the Massachusetts State Building Code Commission and Chief of the Department of Public Safety's Division of Inspection. Further details of my professional experience are described in my curriculum vitae, attached to this affidavit as Exhibit 1.

2. The provisions of the various editions of the Massachusetts State Building Code are well known to me, and I work with the Codes frequently. I am familiar with the Code provisions that pertain to the issues that arise from this case.

3. I have reviewed various documents associated with the civil action filed by Kerri A. Ellis, Administratrix of the Estate of Susan E. Castell (the plaintiff) against 344 Providence Road Realty Trust and Richard J. Wunschel (the defendants), including photographs and diagrams of the building at 11-21 Sutton Street, Northbridge, Massachusetts (the building), certain provisions of the state building codes, the transcript of the Northbridge building inspector's deposition testimony, the State Fire Marshal's report, the Town of Northbridge

Fire Department and Police Department reports, documents from the Southern Middlesex Opportunity Council (SMOC) regarding deleading work done on the building, and the plaintiff's answers to interrogatories.

4. When the building was constructed, in the early 1900's, Deposition of Richard J. Wunschel, Ex. I, Massachusetts had not yet enacted a state building code. The Town of Northbridge adopted a local building code in 1919. Deposition of Rudolph Susienka, Ex. A, at 7-8.

5. The Massachusetts State Building Code (the Code), title 780 of the Code of Massachusetts Regulations, is now in its sixth edition. The sixth edition has been in effect since August 1997.

6. Generally, a building must comply with the version of the building code current at the time the building is constructed or substantially altered. E.g., 780 CMR § 101.1.

7. In May 1997, the defendants participated in a deleading program through SMOC, and contracted with Architectural Deleading, Inc., to carry out certain deleading work. The version of the Code in force at that time was the fifth edition.[1]

8. The fifth edition states that:

> Unless specifically provided otherwise in this code, all existing buildings and structures shall meet and shall be presumed to meet, the provisions of the applicable laws, codes, rules or regulations, bylaws or ordinances in effect at the time such building or structure was erected or *substantially* altered. 780 CMR § 101.1 (5th Ed., 1996) (emphasis added).

9. Architectural Deleading's work included replacing stairways on exterior decks located on the first and second floors of the building. See Ex. D at 12 & 14.

10. The Code defines an alteration as "[a] change or modification of a building or structure . . . that affects safety or health and that is not classified as an ordinary repair." 780 CMR §

---

[1] All further references to the Code in this affidavit are to the fifth edition unless otherwise noted.

201 (5th Ed.). The work performed by Architectural Deleading did not constitute a 'substantial" alteration that would require the building to meet the requirements of the fifth edition of the Code. See 780 CMR § 101.1.

11. Although the Code does state that certain hazardous conditions must be corrected, 780 CMR App. F-103.1, the available means of egress from the decedent's apartment, in my opinion, did not constitute a hazardous condition.

12. This building pre-existed the enactment of the Massachusetts State Building Code and, pursuant to Section 101.1 of the Code, is presumed to meet the provisions of the applicable laws, codes, or ordinances in effect at the time the building was constructed. In my opinion based on a reasonable degree of professional certainty, the work done on the building by Architectural Deleading including replacing the stairway between the first and second floor decks outside the decedent's apartment did not constitute a "substantial" alteration that would require the building to meet the provisions of the fifth edition of the Code. Additionally, in my opinion based upon a reasonable degree of professional certainty, the available means of egress from the decedent's apartment did not constitute a hazardous condition. Rather the means of egress were reasonably safe, and did not contribute to the decedent's death.

Signed under the pains and penalties of perjury this 28th day of April 2003.

*[signature: Charles J. Dinezio]*
Charles J. Dinezio

**Charles J. Dinezio**
Eight Auburn Street
Charlestown, MA 02129
(617) 545-0478
(617) 242-1343

## Professional Experience

*Charles J. Dinezio, Consultant*                                       Currently
Principal and President of firm providing services to the building construction industry for commercial and multi-residential structures including:
- Building code interpretations;
- Plan reviews for code compliance;
- Compliance inspections and inspections for investment;
- Construction inspections;
- Assistance in the adaptive reuse or rehabilitation of existing buildings;
- Permit processing;
- Appeals processing; and
- Providing expert witness testimony.

*Building Consulting Group, Inc.*                                       1992 - 1993
Principal and President of firm providing:
- Structural design and structural analyses;
- Building evaluations for investment; and
- Building code interpretation.

*Massachusetts Executive Office of Public Safety*                      1983 - 1992
During this period, responsible for two State Agencies - Department of Public Safety, Division of Inspection and the Board of Building Regulations and Standards (BBRS) - managing an annual budget of over 3 million dollars and supervising a staff of 100 people.

Division of Inspection, Chief responsible for 3 sections:

*Building Section*
- Issuance of building permits for all state construction projects;
- Inspection performed to assure code compliance; and
- Supervised and provided technical assistance 600 local building officials.

*Engineering Section*
- Inspection of power plants, including nuclear plants, and tanks over 10,000 gallons; and
- Testing and licensing of operators of cranes, bulldozers, backhoes, pipefitters and sprinkler fitters.

*Elevator Section*
- Development and promulgation of State Elevator Code; and
- Inspection of 30,000 elevators statewide.

*Administrator for the BBRS*
- Maintain currency of the State Building Code;
- Oversee building code appeals process;
- Certification of manufactured buildings;
- Licensing of construction supervisors; and
- Act as liaison to the construction industry, professional organizations, federal/state agencies and local governments.

*Phoenix Technology Group, Inc.*                                             1981 - 1983
President and Principal of firm providing services to the building community including:
- Plan reviews for code compliance;
- Compliance inspections and building evaluations for investments;
- Permit processing;
- Appeals processing and expert witness testimony; and
- Building code interpretations, research and resolution of building code problems.

*Massachusetts State Building Code Commission*                               1973 - 1981
Executive Director to Commission:
- Development and promulgation of first statewide mandatory building code;
- Development and implementation of statewide manufactured building program;
- Development and implementation of statewide accreditation of construction laboratories;
- Establishment of procedures for the processing of building code appeals; and
- Development of methodology and code provisions for the adaptive reuse of existing buildings.

*Massachusetts Department of Community Affairs*                              1969 - 1973
- As Supervisor of Training Programs for Code Enforcement Officials, developed and administered education program;
- As Coordinator of the Office of Code Development, analyzed the State's regulatory process as it related to building and housing codes; and
- Assisted in drafting Chapter 802, Acts of 1972 which includes provisions for the development and promulgation of the first statewide mandatory building code.

*Boston Redevelopment Authority*                                             1963 - 1969
As Chief Rehabilitation Officer of the Charlestown Project, supervised 22 staff members, including architects, financial, legal and community liaison professionals, involved with urban renewal programs affecting 2,275 buildings and 5,700 dwelling units.

*Preceding Fifteen Years*
- Employed as Technical Director for one of the largest home remodeling companies in the northeast;
- Employed as a Construction Supervisor in 5 southeastern states by a major southern firm; and
- Principal and President of a general contracting firm for light commercial and residential buildings.

*Consultant services to:*
- Toronto Ministry of Housing Office of Fire Prevention and Control.
- U.S. Department of Commerce, National Institute of Standards and Technology (formerly NBS).
- State of New York (participated as an expert in a study to develop incentives for the retroactive enforcement of sprinkler requirements in existing buildings).
- State University of New York at Buffalo.
- University of Illinois.
- Massachusetts Bay Community College

*Appointments - Special Committees - Organizations*

| | |
|---|---|
| National Conference of State on Building Codes and Standards (NCSBCS) (Appointed as a Delegate by Governors Sargent, Dukakis, King and Weld) | 1972 - 1992 |
| President of NCSBCS | 1977 - 1978 & 1979 - 1980 |
| Member; Board of Directors of NCSBCS | 1972 - 1981 |
| President and Chairman of Board of Trustees, National Academy of Code Administration (NACA) | 1977 - 1982 |
| Member, Rehabilitation Guidelines Steering Committee, National Institute of Building Sciences | 1979 - 1980 |
| Chairman, Department of Energy/NCSBCS Technical Council | 1976 - 1977 |

*Lecturer*

| | |
|---|---|
| Lecturer at major universities/colleges on the administration and/or enforcement of building codes and rehabilitation. | 1970 - 1992 |

*Publications and Awards*

"Handbook for Administration of Housing Code Program", 1970 (co-author)

"Reports Relative to the Development, Administration and Enforcement of Buildings Codes and Housing Codes", 1971 (co-author)

"Removing Regulatory Restraints to Building Rehabilitation: The Massachusetts Experience", 1981 (co-author - Massachusetts Project)

"The Massachusetts Rehabilitation Code", 1980 - Paper presented at the Ontario Renews Forum, Toronto, Canada

"Removing Regulatory Constraints to Building Rehabilitation", 1982 - Paper presented at the Third ASTM/CIB/RILEM Symposium in Lisbon, Portugal (co-author)

**Awards**

| | |
|---|---|
| Chairman of the U. S. Department of Energy/NCSBCS Technical Council | 1978 |
| Nominee for McGraw-Hill's "Construction Man of the Year" Award | 1979 |
| Past Presidents' Award, National Conference of States on Building Codes and Standards | 1981 |

# Sullivan Code Group
## R.W. Sullivan, Inc.

April 21, 2005

Smith & Duggan LLP
Two Center Plaza
Boston, MA 02108-1906

Attn:   Matt Walko

Re:   **Kerri A. Ellis, Administratrix of the Estate of Susan Castell v. 344 Providence Road Realty Trust et al.**

Dear Mr. Walko,

This letter report summarizes my findings regarding the above-referenced case.

I have reviewed the material you have forwarded to me regarding this matter and paid a visit to the site located at 11-21 Sutton Street in Northbridge, MA. The following facts have contributed to my opinion:

- A structure fire originating in the dwelling unit of Susan E. Castell at 11-21 Sutton Street in Northbridge, MA in the early morning hours of March 15, 2000 resulted in the death of Ms. Castell and a guest, Richard Ballard.
- The fire originated in the living room, due to careless disposal of smoking materials according to the Northbridge Fire Department Field Incident Report.
- Ms. Castell died in her bedroom. The Northbridge Police Department Incident Report dated 3/15/2000 describes how Police Officers communicated with Ms. Castell who was calling from the window of her bedroom. In an attempt to rescue Ms. Castell these police officers ascended the exterior egress stair to the porch and attempted to enter at the kitchen door of Ms. Castell's apartment. Mr. Ballard was found unconscious in the kitchen, just inside this door.
- Ms. Castell's dwelling unit was on the second floor of this 2½ story wood frame building. There are two exit doors from her apartment, both leading to an exterior porch. The porch structure incorporated a wood stair providing the sole means of egress from the floor for the occupants of this dwelling unit.
- This wood stair had been replaced in 1997. The Contractor, Architectural Deleading, Inc. (ADI), signed a contract with the owner, Richard Wunschel, dated 7/29/97. Under item #13,

The Schrafft Center
529 Main Street, Suite 203
Boston, MA 02129-1107

617.523.8227 (p)
617.523.8016 (f)
www.rwsullivan.com

Code Consulting . Fire Protection . Mechanical & Electrical Engineering

"Permits and Licenses", of this contract the Contractor agreed that "All permits and licenses necessary for the completion and execution of the work shall be secured and paid for by the contractor. If the contractor observes that the proposed construction is at variance with applicable laws, rules, ordinances, and/or regulations bearing on the conduct of the work, he shall promptly notify the owner in writing. Any necessary change shall be adjusted as provided for in the contract changes in the work. If the contractor knowingly performs work contrary to such laws, ordinances, etc., and without notice to the owner, he/she shall bear all costs arising therefrom. All work shall be performed in conformance with applicable local codes and requirements whether or not covered by Specifications and Drawings from the work".

- There is no record of a permit at the Town of Northbridge Building Department for the work performed by ADI in the Summer of 1997. There are no drawings on file or otherwise for this work.
- The scope of services for this contract is described in a report prepared by John Eastman of Environmental Lead Detection, Inc., dated 5/19/97. This report identifies lead levels at stair support columns, newel posts, handrails, balusters, treads, risers and stringers in two locations, and calls for the replacement of windows, doors and exterior staircases.
- In a "Notification of Deleading Work" Mr. Eastman describes the de-leading methods to be used as "wet/dry scraping", "demolition", and "replacement".
- Construction performed between February 28 1997 and August 27 1997 could adhere to the requirements of either the 5th or the 6th edition of the Massachusetts State Building Code. The 5th edition was repealed on August 27th 1997 after which date all construction in the Commonwealth was required to comply with the requirements of the 6th edition.
- Both the 5th edition and the 6th edition exempt "ordinary repairs" from the requirement that a permit be issued for construction. Both the 5th edition and the 6th edition define "ordinary repairs" as "any maintenance which does not affect the structure, egress, fire protection systems, fire ratings, energy conservation provisions, plumbing , sanitary, gas, electrical or other utilities".
- The work performed by ADI in the summer of 1997 at 11-21 Sutton Street in Northbridge, MA did not qualify as "ordinary repairs" and therefore required a building permit and code compliance under the applicable code.

- We know that the Contractor/Owner Deleading Agreement was signed on July 29, 1997. Invoice #9801 from ADI, dated August 29, 1997, references two previous payments and requests a final payment. And a letter of Lead Paint Reoccupancy Reinspection Certification from John Eastman at Environmental Lead Detection gives a date of September 5, 1997 for his reoccupancy reinspection. The work under the contract therefore apparently took place during the month of August, 1997,
- As an existing building the structure at 11-21 Sutton Street in Northbridge, MA was subject to the provisions of Article 32 ("Repair, Alteration, Addition, and Change of Use of Existing Buildings") in the 5th edition or Chapter 34 ("Repair, Alteration, Addition, and Change of Use of Existing Buildings") in the 6th edition during the summer of 1997.
- Both Article 32 in the 5th edition and Chapter 34 in the 6th edition state that two means of egress are required from every floor of an existing building. Section 3203.7 of the 5th edition states that "any existing building shall provide at least two (2) means of egress serving every story which are acceptable to the building official" (the exceptions to this section do not apply to 11-21 Sutton Street in Northbridge, MA). Section 3404.5 of the 6th edition also requires all existing buildings to provide a minimum of two means of egress as required by 3400.4. Section 3400.4.1 references "the number of means of egress serving every space and/or story, required by 780 CMR 1010.0 and Table 1010.2". Sections 1010.0 and Table 1010.2 require a minimum of two means of egress for "every floor area" of a building with an occupant load of 500 or less. This requirement for a minimum of two means of egress from every floor of an existing building applies to all existing buildings, regardless of whether or not work is performed or a permit issued.
- The building at 11-21 Sutton Street in Northbridge, MA contained five (5) apartments and one restaurant in 1997. As such it constituted a mixed-use building per the definition of the 5th and 6th edition of the Massachusetts State Building Code. Assuming the restaurant accommodated an occupant load of less than 50 then it constituted a Use Group B occupancy. The remainder of the building falls under the designation of Use Group R-2, "multi-family residential".
- If ADI had adhered to the terms of their contract Ms. Castell's apartment would have been provided with a second exit to grade

- as required by both the 5th and 6th editions of the Massachusetts State Building Code.
- On Saturday April 15, 2006 I visited 11-21 Sutton Street in Northbridge, MA which currently contains six apartments. The building has been completely renovated on the exterior (and presumably the interior) with new exit stairs and porches. The bedroom window at which Ms. Castell was last seen has been converted to a door and an exterior walkway provided to an adjacent porch and exterior exit stair. This configuration provides a second independent means of egress from Ms. Castell's former apartment.
- I have reviewed the affidavit of Richard M. Trifero, Building Commissioner for the Town of Paxton, MA, regarding this matter. Applying the requirements of the 5th edition of the Massachusetts State Building Code Mr. Trifero has described in detail the various applicable sections that would have led to the provision of a second means of egress from Ms. Castell's apartment if ADI had adhered to the terms of their contract by securing a building permit.

From the facts stated above I have concluded that, had ADI adhered to the terms of their contract and applied for a building permit to perform code compliant work at 11-21 Sutton Street in Northbridge, MA then, under either the provisions of the 5th or the 6th edition of the Massachusetts State Building Code, a second means of egress from Ms. Castell's apartment would have been provided as part of their operations under the contract. In all likelihood the second means of egress would have been provided as currently configured, allowing the occupant of this dwelling unit to gain access from the bedroom where Ms. Castell was last seen. There is an internal stair to the second floor serving other apartments however modifications to the existing apartment layout would be impractical to achieve access from Ms. Castell's apartment. The exterior balcony connecting to a second exterior porch and exit stair is the most efficient way to achieve a second means of egress from this dwelling unit.

Because the interpretation and application of the Massachusetts State Building Code is so important to the theory of liability in this case I would like to expand upon the main points regarding these matters. While much of the Massachusetts State Building Code is based on model code language the provisions for existing buildings (Chapter 32 in the 5th edition and Chapter 34 in the 6th) are unique to Massachusetts. These

provisions are intended to allow renovation work in existing buildings without requiring the existing building to be brought up to the code requirements for new construction, except in those cases where there is a change of use which results in an increase to the hazardous nature of the occupancy. There are specific exceptions to this approach for egress, lighting and ventilation. In Massachusetts the Building Code always requires two means of egress from every floor, regardless of whether or not any specific work is being performed. The Massachusetts Code is so insistent on this requirement that it has actually modified model code language in the code for new construction, eliminating provisions for residential occupancies with a single means of egress. When an existing building is renovated in general only the new work must comply with the code requirements for new construction. However work performed in an existing building provides an opportunity to eliminate major hazards which have been identified as contributing to fire spread or loss of life. For instance, whenever an existing building is renovated all open stairs that are required for egress must be enclosed so that smoke and fire are prevented from spreading through the floor opening. Similarly, when work is being performed in existing buildings the code requires the installation of exit signs and emergency lighting to illuminate exit paths. The issuance of any building permit invokes these requirements. The requirement to provide a minimum of two means of egress from each floor of an existing building is one of the few requirements in the code that applies regardless of whether or not a permit is issued. In fact, the Building Official is required to evacuate an existing building when the minimum number of required exits is not provided, regardless of whether or not any work is being performed.

The work performed at 11-21 Sutton Street in Northbridge did not qualify as ordinary repairs. Both the window and door replacement and the stair replacement are regulated by the Massachusetts State Building Code and therefore require the issuance of building permits. The extent of repair (i.e., whether or not the work was considered "substantial") has no bearing on this requirement.

Nor does the Use Group classification bear on the requirement for a permit. A single-family dwelling undergoing window replacement and stair replacement would also require a building permit. The layout of the building at 11-21 Sutton Street, however, can only be classified as mixed use with multifamily (Use Group R-2) and restaurant (probably Use Group B if less than 50 people). While the building code does recognize a building type known as "multiple single-family" (Use Group R-3) such a

344 Providence Road Realty Trust
April 21, 2006
Page 6

building type consists of multiple adjacent dwelling units, separated by fire-rated construction, and each with independent egress. Even Use Group R-3 requires two independent means of egress from every dwelling unit in Massachusetts. While several of the dwelling units at 11-21 Sutton Street had access to two independent means of egress to grade the dwelling unit where Ms. Castell and Mr. Ballard were trapped by fire on the morning of March 15, 2000 did not.

An argument could be made that, due to the layout at Ms. Castell's apartment, it would be impractical to provide a second means of egress. Both Chapter 32 of the 5th edition and Chapter 34 of the 6th edition allow for the approval of "compliance alternatives" by the Building Official when meeting the requirements of these chapters is deemed impractical "due to regulatory conflict or construction difficulties". An appendix at the back of the code (Appendix F) even provides examples for compliance alternatives with regard to number of means of egress that can be accepted by a Building Official. These examples involve installing a fire escape or fire balcony, or, in the example of a basement dwelling unit, providing an "egress window".

A fire balcony at Ms. Castell's bedroom window connecting to the adjacent dwelling unit could have saved her life. A fire balcony could have been installed with relatively little expense or effort at the time that the operations under the contract was performed. Because ADI did not apply for a permit the Building Official was never given the opportunity to review the egress from Ms. Castell's dwelling unit or to exercise his rights to approve a "compliance alternative".

In agreeing to the terms of the contract at 11-21 Sutton Street ADI assumed the responsibilities of a licensed builder in the Commonwealth of Massachusetts. These include full compliance with the requirements of the Massachusetts State Building Code. In order to obtain a Builder's license in the Commonwealth an individual must pass a written test demonstrating understanding of the Massachusetts State Building Code.

I conclude that the failure of ADI to obtain a building permit for the work that they performed at 11-21 Sutton St. in Northbridge in August of 1997 constituted a deviation from the standard of care for a licensed builder, and that this deviation prevented an opportunity to provide code compliant egress, or even some acceptable compliance alternative such as a fire balcony, from being provided for Ms. Castell's apartment.

*344 Providence Road Realty Trust*
*April 21, 2006*
*Page 7*

My opinions in this case are based upon a normal degree of professional certainty and the evidence produced, as well as the relevant codes and other publications commonly relied upon in the field, as well as upon my extensive knowledge as a registered architect and certified building official.

Accompanying this letter are annotations to photographs you have provided for the subject property. If you have any questions please do not hesitate to call.

SULLIVAN CODE GROUP

*[signature]*

A. VERNON WOODWORTH, AIA
C:\Documents and Settings\dec\Desktop\SCG Forms\letter head.doc

*344 Providence Road Realty Trust*
*April 21, 2006*
*Page 8*

Photographs of 11-21 Sutton Street in Northbridge, MA.

VW photo 1: 11-21 Sutton Street shown prior to the fire. The porch with single stair is shown at the gable end of the structure.

VW photo 2: The other end of 11-21 Sutton Street shown prior to the fire. The restaurant is located in the protruding section at the ground floor.

VW photo 3: Firefighter operations underway on the morning of March 15, 2000. Smoke is pouring from Ms. Castell's apartment and the second floor porch appears heavily damaged by fire.

VW photo 4: A different angle shows that the roof of the porch has served to contain and intensify the heat, smoke and flame from the fire as it makes its way through the two doors from Ms. Castell's apartment. The vinyl siding at the exterior wall at the porch indicates the intensity of heat at this location, the sole egress from Ms. Castell's apartment.

VW photo 5: View of the two windows from Ms. Castell's apartment at the rear of the building taken shortly after the fire. Again, the heat of the blaze is indicated by the melted siding above and adjacent to the two windows.

VW photo 6: Similar view to #5.

VW photo 7: Similar view to # 5.

VW photo 8: The front of the building taken shortly after the fire. The extent of damage to the siding and roof is even greater than on the back side.

VW photo 9: View from the Living Room of Ms. Castell's apartment looking towards the door to the porch. This end wall has been completely destroyed by the fire.

VW photo 10: View from Ms. Castell's bedroom window. The window frame is completely charred.

VW photo 11: Similar view to #10.

VW photo 12: View looking into Ms. Castell's bedroom from the living room. The door and frame are heavily charred, suggesting the extent of heat and fire at this exit path.

VW photo 13: View of Ms. Castell's kitchen.

VW photo 14: Unknown view.

VW photo 15: Bedroom interior.

VW photo 16: Living room at porch. The wall studs are almost completely burned through.

VW photo 17: Unknown view.

VW photo 18: Unknown view.

VW photo 19: Interior view at second floor showing extent of fire damage to studs and sheathing.

VW photo 20: View of kitchen showing extent of fire damage.

VW photo 21: Kitchen door to porch showing extent of fire damage.

VW photo 22: View into bathroom.

VW photo 23: Gable end of building shortly after fire showing extent of fire damage. The new exit stair is clearly visible as unpainted stringers, balusters and rails.

VW photo 24: Street façade showing extent of damage to roof and siding.

VW photo 25: Corner at porch and front façade.

VW photo 26: Street view of whole building showing how fire was confined to the second floor of the gable end, Ms. Castell's apartment and attic above.

VW photo 27: View of 2nd floor porch after boarding.

VW photo 28: Similar to #27.

*344 Providence Road Realty Trust*
*April 21, 2006*
*Page 10*

VW photo 29: Similar to #27.

VW photo 30: Interior of Ms. Castell's bedroom after boarding.

VW photo 31: Second floor porch and roof showing extent of fire damage.

VW photo 32: Similar to #30.

VW photo 33: Similar to #31.

VW photo 34: 11-21 Sutton St. during renovation and repairs, front view.

VW photo 35: 11-21 Sutton St. during renovation and repairs, partial front view.

VW photo 36: 11-21 Sutton St. during renovation and repairs, partial front view.

VW photo 37: 11-21 Sutton St. during renovation and repairs, partial front view.

VW photo 38: Gable end view prior to installation of porches.

VW photo 39: Similar to 38.

VW photo 40: Rear view of building during renovations. A door has been installed at the former location of Ms. Castell's bedroom window. Egress has not yet been provided from this door.

VW photo 41: Oblique view of rear of building looking towards exterior porches and stair.

VW photo 42: View of rear porches and stair during renovations.

VW photo 43: Similar to 42.

VW photo 44: View from Sutton St. bridge towards gable end of building during construction.

VW photo 45: Similar to 44.



1330.033 VW pho 1.



1330.033 VW PHO 2.



1330.033 VW PHO 3.



1330.033 VW PHO 4.



1330.033 VW PHO 5.



1330.033 VW PHO 6.